**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SAN LUIS OBISPO COASTKEEPER; LOS PADRES FORESTWATCH; CALIFORNIA COASTKEEPER ALLIANCE; ECOLOGICAL RIGHTS FOUNDATION, | No. 24-7807 |
| | D.C. No. 2:24-cv-06854-SPG-AS |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| COUNTY OF SAN LUIS OBISPO, | |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Sherilyn Peace Garnett, District Judge, Presiding

Argued and Submitted August 12, 2025
Pasadena, California

Filed December 3, 2025

Before: Jacqueline H. Nguyen, Danielle J. Forrest, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Nguyen;
Concurrence by Judge VanDyke

## SUMMARY[*]

### Endangered Species Act

The panel vacated the district court's mandatory preliminary injunction requiring the County of San Luis Obispo to take certain actions in its management of the Lopez Dam and Reservoir, and remanded for further proceedings, in a case in which environmental non-profit organizations ("the NGOs"), who allege decades of noncompliance with proper permitting processes, seek to protect and improve the habitat of threatened South-Central California Coast steelhead trout that reside downstream from Lopez Dam.

The NGOs contend that the County's operations are causing an unlawful take of the steelhead in violation of section 9 of the Endangered Species Act ("ESA") and are separately violating California Fish & Game Code ("CFGC") section 5937 by failing to release sufficient water to maintain the fish in "good condition."

Also populating the waterway is the California red-legged frog and the tidewater goby—species equally entitled to the ESA's protections. The County contends that the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

preliminary injunction, though beneficial to the steelhead, will endanger the other species.

A mandatory preliminary injunction, unlike a prohibitory one, does not serve to preserve the status quo pending resolution of the merits but instead compels the nonmoving party to take affirmative action.

Deriving from the Supreme Court's ruling in *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978), as expanded by the Ninth Circuit, courts have no discretion to balance equities or the public interest when considering whether to grant a preliminary or permanent injunction in any ESA case. This is because Congress already did so in deciding that endangered species would take precedence "whatever the cost."

This rationale, however, collapses where protecting one listed species might jeopardize another—as here. The tension is even sharper where the injunction was mandatory, not prohibitory.

The panel held, accordingly, that when mandatory injunctive relief under the ESA may benefit one protected species at the expense of other protected species, a court must consider competing equities and the public interest as to those other species. This holding does not open the door to all the usual equities—economic, developmental, or otherwise—as Congress was clear that endangered species come first, whatever the cost.

Here, the district court summarized the evidence regarding the California red-legged frog and tidewater goby, but it did not weigh the balance of equities or the public interest, and it drew no conclusions about how the evidence should factor into its decision. The district court's analysis,

therefore, did not satisfy the standard for a mandatory preliminary injunction under the ESA. The panel instructed the district court, on remand, to weigh the evidence on all affected species.

The panel agreed with the district court's application of the full test set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), to the NGOs' request for injunctive relief pursuant to CFGC section 5937. But for the reasons set forth in the ESA context, the district court's actual analysis of the equities and the public interest fell short. The district court's CFGC section 5937 analysis likewise remains unfinished, so the panel vacated the preliminary injunction on this claim as well.

Concurring, Judge VanDyke joined the majority in full. He wrote separately to emphasize the demanding standard that must be met before a district court may issue a mandatory preliminary injunction, a standard that has become even harder to satisfy in cases like this one which involve the complicated interplay between different species.

## COUNSEL

Christopher Sproul (argued), Brian Orion, and Marla Fox, San Francisco, California; Drevet J. Hunt, California Coastkeeper Alliance, Sacramento, California; for Plaintiffs-Appellees.

Paul S. Weiland (argued) and Benjamin Z. Rubin, Nossaman LLP, Irvine, California; Brian Ferrasci-O'Malley, Nossaman LLP, Seattle, Washington; for Defendant-Appellant.

Damien M. Schiff and Charles T. Yates, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Pacific Legal Foundation and California Farm Bureau Federation.

Barbara A. Brenner and Kerry A. Fuller, White Brenner LLP, Sacramento, California, for Amicus Curiae City of Arroyo Grande.

Jeremy N. Jungreis and Scott C. Cooper, Rutan & Tucker LLP, Irvine, California, for Amicus Curiae Association of California Water Agencies, California State Association of Counties, and California Special Districts Association.

Peter M. K. Frost, Western Environmental Law Center, University of Oregon School of Law, Eugene, Oregon, for Amicus Curiae Law School Faculty.

Adam Keats, Law Office of Adam Keats PC, San Francisco, California; M. Benjamin Eichenberg and Eric J. Buescher, San Francisco Baykeeper, Oakland, California; for Amici Curiae California Water Impact Network, Center for Biological Diversity, San Francisco Baykeeper, Sierra Club, Friends of the River, Bring Back the Kern, Kern Audubon Society, Kern River Parkway Foundation, and Environmental Defense Center.

Deborah A. Sivas, Matthew J. Sanders, and Amanda Zerbe, Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Stanford, California, for Amici Curiae Fisheries Biologists Peter Moyle, Theodore Grantham, and Karrigan Börk.

# OPINION

NGUYEN, Circuit Judge:

Recognizing that the extinction of wildlife species carries grave "esthetic, ecological, educational, historical, recreational, and scientific" consequences, Congress enacted the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, in 1973.  *See id.* § 1531(a)(1)–(3).  In so doing, Congress created a statutory scheme intended "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("*TVA*").  Since its passage, the ESA has served as a powerful tool frequently invoked by non-governmental organizations working to protect threatened or endangered species.  These organizations often seek preliminary injunctions to halt activities that could harm such species. The Supreme Court in *TVA* recognized that when evaluating the equities and the public interest, "the balance has been struck in favor of affording endangered species the highest of priorities," *id.* at 194, and "the value of endangered species [is] 'incalculable,'" *id.* at 187.  This court, therefore, does not consider the balance of equities and the public interest when deciding whether to issue preliminary injunctions under the ESA.  *See Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994) ("[T]he ESA demonstrates Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species."); *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015) (Congress has "strip[ped] courts of at least some of their equitable discretion in determining whether injunctive relief is warranted.").

This case, however, tests the logic of our approach.  The County of San Luis Obispo ("County") appeals a mandatory preliminary injunction requiring it to take certain actions in its management of the Lopez Dam and Reservoir.  A group of environmental non-profit organizations—San Luis Obispo Coastkeeper, Los Padres ForestWatch, California Coastkeeper Alliance, and Ecological Rights Foundation (collectively, "the NGOs")—filed suit against the County, alleging decades of noncompliance with proper permitting processes.  The NGOs sought an injunction to protect and improve the habitat of threatened steelhead trout that reside in Arroyo Grande Creek ("AG Creek") downstream from the Lopez Dam.  But the steelhead is not the only ESA-listed species living in AG Creek.  Also populating the waterway is the California red-legged frog and the tidewater goby— species equally entitled to the ESA's protections.  The County contends that the preliminary injunction, though beneficial to the steelhead, will endanger the other species.

We hold that when mandatory injunctive relief under the ESA may benefit one protected species at the expense of other protected species, a court must consider competing equities and the public interest as to those other species.  Because the district court here did not do so, we vacate the preliminary injunction and remand for further proceedings.

## I.  FACTUAL AND STATUTORY BACKGROUND

### A.

The steelhead is an anadromous fish, meaning that it hatches in freshwater streams, migrates to the ocean to mature, and then returns as an adult—often multiple times during its lifespan—to spawn.  The various stages of its lifecycle depend on high, pulsing flows of freshwater from creeks and rivers, such as AG Creek.  During the wet months

of January through March, the surge of freshwater entering the ocean signals to adult steelhead that it is time to migrate upstream and spawn. When they reach the mouth of the creek, stronger streamflow helps form and sustain coastal lagoons, which serve as important developmental habitats before the juvenile steelhead head to sea. In drier periods, however, sandbars often form between the lagoon and the ocean—effectively cutting off access. The high flows breach those sandbars, allowing adult steelhead to reenter the stream to spawn and juveniles to exit to the ocean.

Flow levels also shape the quality of the streambed itself. Steelhead need gravel streambeds with minimal sediment to support egg nests, and high flows clear fine sediment from the streambed, exposing the coarser gravel substrates. Juvenile steelheads also require adequate streamflow to facilitate natural variations in channel shape and create the pools and riffles that are essential for feeding, resting, and overall survival.

## B.

The National Marine Fisheries Service ("NMFS") regulates marine and anadromous fish, including the steelhead, under the ESA. Since 1997, the NMFS has listed the steelhead of the South-Central California Coast ("SCCC steelhead"), which includes the steelhead in AG Creek, as threatened. *See* 62 Fed. Reg. 43,937, 43,953 (Aug. 18, 1997); 71 Fed. Reg. 834, 857 (Jan. 5, 2006). In 2006, the NMFS further identified the SCCC steelhead as a Distinct Population Segment ("DPS") of the fish species. 71 Fed. Reg. at 859. That designation reflects the agency's determination that the SCCC steelhead is genetically important to the species as a whole and merits protection to preserve its genetic diversity and adaptive potential. The

NMFS has also designated the steelhead in AG Creek as a "Core-1" population, meaning that its survival is "vitally important to the recovery and survival of the broader Steelhead DPS as a whole."

The AG Creek coastal watershed is over 150 square miles located in the west-central portion of the County. As a result of extensive habitat degradation elsewhere, it is one of the few remaining coastal watersheds in central California that can support steelhead runs. 70 Fed. Reg. 52,488, 52,507 (Sep. 2, 2005). In 2005, the NMFS designated AG Creek as a critical habitat that remained "essential for conservation" of the SCCC steelhead. *Id.* at 52,508. It has also continued to reaffirm the creek's ecological importance.

## C.

Constructed in 1969, the Lopez Dam is located about thirteen miles upstream from the mouth of AG Creek and is operated by the County. Standing 160 feet tall and lacking any fish passage infrastructure, the dam entirely blocks steelhead from reaching the creek's headwater tributaries. *Id.* at 52,507–08. According to an NMFS report, these upstream tributaries constitute approximately 64% of the high-quality habitat that steelhead would otherwise use. The NGOs' expert ecologist, Tevin Schmitt, opines that the migration cycle to and from the upper AG Creek habitat is crucial for steelhead survival, but the dam prevents all access.

Schmitt further contends that the County's operation of the dam has significantly degraded the remaining habitat below the dam. Since 2007, the County has been operating Lopez Dam according to its Interim Downstream Release Schedule ("IDRS"). The IDRS does not provide a specific numeric schedule for releases of water but plans releases

depending on hydrologic conditions and downstream demands. The result, however, is a seasonal pattern in which the County releases higher flows from July through November—typically the driest months—and lower flows from December through June, which coincides with the peak steelhead migration and spawning season. On average, this practice reduces downstream water flow by approximately 41%.

The NGOs argue that the IDRS eliminates the kind of pulsing, high flows essential to triggering steelhead migration and supporting the species' life cycle. They further claim that these altered flows raise water temperatures in the lower creek, encouraging the presence of warm-water predators that prey on juvenile steelhead. Compounding the issue, according to the NGOs, is the County's failure to prevent predatory, non-native fish from spilling over the dam into the creek below during reservoir overflow events.

Finally, the NGOs contend that the County's construction and maintenance of road culverts and flood control levees in AG Creek have further impeded the steelhead's migration. The levee system narrows what was once a broad, dynamic floodplain, reducing the riparian vegetation and habitat complexity steelhead rely on. The culverts, meanwhile, often become clogged with debris, creating additional barriers to upstream migration.

### D.

Regulations enacted under to the ESA proscribe the "take" of threatened steelhead DPS, including SCCC steelhead. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 223.203(a). The statute defines "take" broadly to include conduct such as "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

The ESA provides some exceptions to its prohibition of takes. Under section 10, an otherwise prohibited take by a non-federal entity may be authorized by an incidental take permit ("ITP"), "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Because the NMFS regulates marine and anadromous fish, it handles any ITPs for take of such species. To obtain such a permit, the applicant must submit a habitat conservation plan ("HCP"), which must specify "the impact which will likely result from such taking;" "what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;" "what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized;" and such other measures that NMFS or the United States Fish and Wildlife Service ("USFWS") may require. 16 U.S.C. § 1539(a)(2)(A).

In 1999, prompted by the NMFS's repeated warnings that the County's operation of Lopez Dam would require ESA authorization, the County initiated environmental impact studies. In 2004, it submitted to the NMFS its draft HCP as a first step toward securing an ITP. In the HCP, the County identified and estimated several ways in which the dam's operations harmed the steelhead. But the NMFS found the HCP inadequate and that substantial revisions to the proposed flow schedule were needed. Since then, despite promptings from the NMFS, the County has yet to develop another HCP and ITP application. The NGOs bring this suit to force the County into compliance.

## II. PROCEDURAL HISTORY

Shortly after filing, the NGOs moved for a mandatory preliminary injunction. The NGOs contend that the County's operations are causing an unlawful take of the SCCC steelhead in violation of ESA section 9 and are separately violating California Fish & Game Code ("CFGC") section 5937 by failing to release sufficient water to maintain the fish in "good condition." The NGOs requested that the district court order the County to take certain actions, including, but not limited to, submitting and implementing a proposed plan for releasing sufficient flows from Lopez Dam into the lower AG Creek area. The NGOs emphasized that preliminary relief was time-sensitive, as the steelhead's winter migration season—triggered by the first substantial rains—could begin as early as November.

Both sides submitted extensive evidence, including expert declarations addressing the dam's effects on AG Creek's habitat and the steelhead. The County provided additional evidence that the endangered tidewater goby and threatened California red-legged frog are also known to inhabit the AG Creek watershed. The tidewater goby inhabits the lower creek area and the lagoon while the California red-legged frog inhabits the AG Creek generally. County expert Mark Jennings opined that the schedule of pulse-flow and base-flow releases from the dam proposed by the NGOs to help the steelhead would dislodge the tidewater goby or red-legged frog nests or egg masses, resulting in a take. The NGOs countered with a competing expert analysis suggesting that increased flows would, in fact, improve habitat conditions for both species by reducing the presence

of non-native predators and providing them necessary water.[1]

On November 27, 2024, the district court granted the NGOs' motion for a mandatory preliminary injunction in part. On December 9, 2024, the district court issued a preliminary injunction order that adopted most of the NGOs' requested relief. The order requires extensive action by the County, including to develop, implement, and study a flow release plan, and set a base flow release schedule depending on the amount of water in Lopez Reservoir; regularly monitor and clear debris from culverts; develop and implement a plan for installation of a fish screen across the Lopez Dam; develop a plan for studying volitional steelhead passage past Lopez Dam and implementing a feasible alternative that is identified; and develop and submit an HCP and an ITP application to the USFWS and NMFS on an expedited timeline.

The preliminary injunction also instructs the County to request input and guidance from the NMFS and USFWS in implementing these measures. Consistent with those requirements, the County submitted a proposed plan for flow release to the NMFS and USFWS for their review and comment. But on January 7 and 10, 2025, the County received responses from the USFWS and NMFS, respectively, declining to comment on any of "the various interim measures specified in the Preliminary Injunction Order." Instead, the agencies recommended that the County coordinate with them through the ITP process to develop an

---

[1] Unrelated to threatened species, the County also presented declarations from public agency officials who receive drinking water from operation of Lopez Dam and Reservoir, discussing, among other things, adverse consequences that would result from reduced water supply.

HCP to avoid, minimize, and mitigate potential impacts to California red-legged frog and tidewater goby from Lopez Dam management activities to ensure compliance with the ESA.

## III.  STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1331 and § 1367. Our review of a district court's grant of a preliminary injunction is both limited and deferential. *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024) (citing *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc)).  The scope of our review is confined to "determining whether the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *Burlington*, 23 F.3d at 1510.  A finding of fact is clearly erroneous "if it is implausible in light of the record, viewed in its entirety, or if the record contains no evidence to support it." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005) ("*NWF I*") (citation omitted).

This deference, however, is lessened when the preliminary injunction is mandatory.  A mandatory preliminary injunction, unlike a prohibitory one, does not serve to preserve the status quo pending resolution of the merits but instead compels the nonmoving party to take affirmative action. *See Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Such injunctions are disfavored. *Garcia*, 786 F.3d at 740.  Consequently, where the injunction is mandatory, as is the case here, the relief "is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party."

*Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (citing *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)); *Garcia*, 786 F.3d at 740.

## IV.  DISCUSSION

We grapple with two questions.  First, how should the district court weigh the interests of the California red-legged frog and tidewater goby—both ESA-listed species.  Second, did the district court properly do so.

The County takes the view that, notwithstanding *TVA*, the district court had to balance the equities and the public interest because the injunction might affect the goby and the frog.  Not doing so, it argues, was a legal error warranting reversal.  And if such a balance must be struck, the County adds, then it must consider all equities and all interests—not just those of the protected species.  The NGOs, on the other hand, read *TVA* and its progeny as taking equitable balancing off the table altogether in ESA cases, regardless of whether other listed species might be implicated.  But they also insist that, regardless, the district court *did* consider the effect of its order on the goby and frog and still thought an injunction was warranted.

The County challenges the injunction under the NGOs' CFGC section 5937 claim as well, arguing that the NGOs failed to show a likelihood of success and irreparable harm.  And, like the ESA claim, the parties reprise their argument over whether the court must balance the equities and public interest under CFCG section 5937.[2]

---

[2] The County and the NGOs also disagree as to whether the preliminary injunction was sufficiently narrowly tailored.  Because we conclude that

## A.

In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Supreme Court set out the familiar four-factor test.  A party is entitled to a preliminary injunction if it demonstrates "(1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Flathead*, 98 F.4th at 1190 (cleaned up).

But in ESA cases, there is an exception to the last two factors, originating from the Supreme Court's ruling in *TVA*. In *TVA*, the Tennessee Valley Authority had nearly finished building the Tellico Dam when biologists discovered that the reservoir it would create would wipe out the only known habitat of the snail darter, at the time thought to be a tiny species of perch fish.  437 U.S. at 156–61.  Soon after that discovery, Congress enacted the ESA, and the Secretary of the Interior listed the snail darter as endangered.  Completion of the dam, the Secretary concluded, would destroy the species' habitat.  *Id.* at 160–62; 40 Fed. Reg. 47,505–06 (Oct. 9, 1975).

Environmental groups filed a lawsuit seeking to enjoin completion of the dam and impoundment of the reservoir on the ground that those actions would violate the ESA.  *TVA*, 437 U.S. at 164–65.  The district court agreed that the dam would "result in the adverse modification, if not complete destruction, of the snail darter's critical habitat,' making it 'highly probable' that 'the continued existence of the snail

---

the district court erred in its assessment of the balance of equities and the public interest for both the ESA and CFGC section 5937 claims, we do not address the remaining arguments.

darter' would be 'jeopardize[d].'" *Id.* at 165–66 (alteration in original) (footnote omitted). But it nonetheless denied the request for a permanent injunction, explaining that the project was nearly completed and "'there [were] no alternatives to impoundment of the reservoir, short of scrapping the entire project.'" *Id.* at 166 (alteration in original). The district court found that if the relief sought were granted "[s]ome $53 million would be lost in nonrecoverable obligations," which Congress could not have intended when it passed the ESA. *Id.* at 166–67 (alteration in original).

The Supreme Court disagreed. Beginning with an "examination of the language, history, and structure of the" ESA, the Court found "beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174. Tracing the evolution of legislative activity leading up to the ESA and the various congressional debates on the issues, the Supreme Court observed as to section 7 that the "pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority." *Id.* at 185; *see also id.* at 188 (noting that Congress did include some exceptions to the ESA's sweep in section 10, "meaning that under the maxim *expressio unius est exclusio alterius*, we must presume that these were the only 'hardship cases' Congress intended to exempt"). It held that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

Concluding "that there [was] an irreconcilable conflict between operation of the Tellico Dam and the explicit provisions of" section 7, the Court turned to the question of "what remedy, if any, is appropriate." *Id.* at 193. The Court

held that because "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities," *id.* at 194, the district court's denial of a permanent injunction was reversible error, *see id.* at 168, 195.

Congress amended the ESA shortly after *TVA* was decided.  Those amendments "lightened the load" imposed by the 1973 Act by moderating the ESA's absolute requirements.  *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023).  The amendments also created a new administrative mechanism—the Endangered Species Committee, sometimes called the "God Squad"—to grant exemptions in exceptional cases.  *See* Act of Nov. 10, 1978, Pub. L. No. 95-632, 92 Stat. 3751; *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 687 (2007) (Stevens, J., dissenting).

Despite Congress's statutory change and the fact that *TVA* specifically addressed the application of section 7, the Ninth Circuit has expanded the rule of *TVA*—that courts have no discretion to balance equities or the public interest when considering whether a permanent injunction is warranted under section 7—to the consideration of any injunction, preliminary or permanent, sought in any ESA case.  For instance, in *Flathead*, we affirmed the district court's order granting a preliminary injunction to limit Montana's authorization of wolf trapping and snaring that resulted in the unlawful taking of the threatened grizzly bear. 98 F.4th at 1184–85.  We reiterated that when analyzing a request for preliminary injunctive relief under the ESA, "only the first two factors" of the *Winter* test "are at issue." *Id.* at 1190; *see also Burlington*, 23 F.3d at 1509, 1511

(describing that "[t]he 'language, history, and structure' of the ESA demonstrates Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species" when assessing an injunction enjoining a railroad from striking the threatened grizzly bears in Montana); *NWF I*, 422 F.3d at 793–94 (citing *TVA* when assessing a preliminary injunction regarding the management of dams in the Columbia River Basin and the protection of the threatened steelhead); *Cottonwood*, 789 F.3d at 1090 (because Congress has "strip[ped] courts of at least some of their equitable discretion in determining whether injunctive relief is warranted," "courts do not have discretion to balance the parties' competing interests in ESA cases" (citing *TVA*, 437 U.S. at 185)).

**B.**

While our precedent holds that ESA cases depart from the usual *Winter* framework, that does not settle the present case. *TVA* and its progeny dealt with injunctions halting disruptions to natural habitats—a quintessential conflict caused by the "economic growth and development untempered by adequate concern and conservation" that Congress was specifically concerned about. 16 U.S.C. § 1531(a)(1). In this context, courts do not consider the balance of the equities and the public interest, because Congress already did so in deciding that endangered species would take precedence "whatever the cost." *TVA*, 437 U.S. at 184.

This rationale, however, collapses where protecting one listed species might jeopardize another—as here. This conflict is not merely between unchecked development and conservation. It is additionally between the interests of multiple protected species. The injunction at issue seeks to

protect the SCCC steelhead.  But evidence presented to the district court also shows that the injunction could harm the California red-legged frog and the tidewater goby, both of which are also entitled to ESA protection.  The question that *TVA* answered—whether a court can displace Congress's intent that "endangered species [are] to be afforded the highest of priorities," *id.* at 174—is therefore not dispositive.

Rigidly applying *TVA* in this context risks turning the ESA on its head.  The first two *Winter* factors—the only ones left under *TVA*—look solely to the plaintiff's likelihood of success of showing an unlawful take and the irreparable harm to the species the plaintiff has sued to protect.  Nothing in that inquiry leaves room to account for the frog or goby.  The ESA's command to prioritize endangered species becomes a one-way ratchet, favoring one listed species without any room to weigh the cost to another.

And the tension is even sharper here because the injunction was mandatory, not prohibitory.  Ordering a party to stop harmful conduct is one thing; compelling it to act affirmatively in a way that could harm other species is another.  Without equitable discretion, a court could end up ordering relief that saves one species at the expense of another.

Accordingly, we hold that district courts retain their equitable discretion when considering a mandatory preliminary injunction under the ESA that could endanger other listed species.  The exception to the traditional test, created in *TVA*, does not apply.  The court must balance the equities and consider the public interest as to the other listed species.

That does not mean, however, that the door is open to every and all interests and equities.  We reject the County's

position that this holding resurrects all the usual equities—economic, developmental, or otherwise.  Congress was clear that endangered species come first, "whatever the cost."  *Id.* at 184.  So the only equities that matter here are those related to the interest of other ESA-listed species.

To be clear, our holding does not require a district court to deny relief whenever another species might be affected. Habitats are complex.   Species are interconnected. Sometimes, what looks harmful to one species in the short term may benefit it, or others, in the long run.  And if there is no way to reconcile the risks to multiple listed species, the equities and public interest in species conservation, to which the ESA gave precedence, do not counsel a single outcome and judgments may need to be made about the relative strength of these considerations in relation to the protected species at issue.  If courts had to reject an injunction every time a defendant could point to another at-risk species, the ESA's protections would become hollow in these circumstances.  We leave it to the district courts to assess whether a mandatory preliminary injunction for the protection of one species is appropriate despite the risks to others.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("[T]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case.  Flexibility rather than rigidity has distinguished it." (internal quotation marks omitted) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944))).  But our decision requires that district courts weigh the risks and benefits to all ESA-listed species in play and then decide whether an injunction is warranted.

## C.

Despite the district court's best efforts, the frog and goby received no meaningful consideration. Implicitly recognizing the illogical result of applying *TVA* to the facts of this case, the district court attempted to bridge the gap by directing the parties to consult with federal agencies to ensure the goby and frog would not be harmed. But attempting to involve the appropriate federal agencies is not an adequate substitute for the exercise of informed discretion, as the record here highlights. The NMFS and USFWS declined to weigh in, instead directing the County to pursue the formal HCP and ITP processes. But those processes can take months or years, and the critical wet season is fast approaching.

As the NGOs point out, the district court dedicated a portion of its order to describing the evidence concerning the creatures. It did not, however, proceed to weigh the balance of equities or the public interest before granting injunctive relief. The district court summarized the evidence presented by both sides regarding the California red-legged frog and the tidewater goby, but it drew no conclusions about how that evidence should factor into its decision.

For instance, the district court observed that the County's proffered expert,

> Dr. Jennings[,] claims that [the NGOs'] proposed flow schedule would harm the tidewater goby, because "any large rainstorms" during the tidewater goby's breeding season along with the increased downstream flows would sweep out the juvenile and adult gobies. In response, [the

NGOs'] expert, Tevin Schmitt, disagrees with Dr. Jennings' conclusion and suggests that the proposed flow release schedule "includes an adequate adaptive management process" that could adjust the flows and avoid any harm to the other species.

But rather than weigh the evidence, the court instead directed the parties to work with the agencies to implement the injunction in a way that protected all species. The district court's analysis, therefore, does not satisfy the mandatory preliminary injunction standard.

On remand, the district court must weigh the evidence on all affected species. The district court may decide that some or all of the prior measures should be reinstated. For example, the County pointed only to the flow-related provisions as potentially harmful to the frog and goby. It is possible that other aspects of the injunction may also be reinstated. But that decision must be made by the district court in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976).

## D.

We turn now to the NGOs' request for injunctive relief pursuant to CFGC section 5937. The district court found that the text of the statute does not answer the question of whether CFGC section 5937 prioritizes the preservation of fish above other competing water uses. It therefore weighed all the factors under *Winter* and held that they favored the NGOs. We agree with the district court's application of the full *Winter* test to the NGOs' state law claim. But, for reasons we've already explained in the ESA context, the

court's actual analysis of the equities and the public interest fell short.

We start with why the ESA exception does not apply to the NGOs' claim under CFGC section 5937. That exception derives from *TVA*, which rested on Congress's unmistakable command that endangered species be given "the highest of priorities." 437 U.S. at 174. That congressional judgment obviously does not extend to a California statute. And the caselaw the NGOs rely on does not fill the gap. In *California Trout, Inc. v. Superior Court*, 218 Cal. App. 3d 187 (1990) ("*Cal. Trout II*"), the state court explained that "the Legislature has already balanced the competing claims for water . . . and determined to give priority to the preservation of their fisheries." *See* 218 Cal. App. 3d at 201. But that statement was about CFGC section 5946, not section 5937. And CFGC section 5946 incorporates section 5937—not the other way around. The state court's interpretation of CFGC section 5946 cannot be mapped onto section 5937 based on the *California Trout* cases. Indeed, the state court has "not explicitly [held] that § 5937 mandates placing the preservation of fish above the irrigation purposes of a dam, but reserves the question of the statute's application alone as a rule affecting appropriation of water, separate from § 5946." *Nat. Res. Def. Council v. Patterson*, 333 F. Supp. 2d 906, 920 (E.D. Cal. 2004) ("*Patterson II*") (citing *Cal. Trout, Inc. v. State Water Res. Control Bd.*, 207 Cal. App. 3d 585 (1989) ("*Cal. Trout I*")).

But while the district court was correct in applying the full *Winter* test, its analysis was incomplete. The district court found that the County's evidence of concerns about the water supply for residential, agricultural, and municipal purposes does not outweigh the other interests at stake. Yet it never spelled out what those other interests or equities are.

Presumably, it had in mind the same considerations it discussed under the ESA. But, as we discussed, that ESA analysis was insufficient. The district court did not explain which evidence it found more persuasive or how the equities and public interest ultimately came out. Therefore, like the ESA claim, the district court's CFGC section 5937 analysis remains unfinished. We vacate the preliminary injunction on this claim as well.

## V. CONCLUSION

We hold today that when a district court considers a mandatory preliminary injunction under the ESA and the evidence shows that other listed species may also be affected, the *TVA* exception to the *Winter* test does not apply. In that circumstance, the court must weigh the balance of equities and the public interest solely as they bear on those other species. Because the district court here did not do so, we vacate the preliminary injunction and remand for further proceedings consistent with this opinion.[3]

**VACATED AND REMANDED.**

---

[3] The NGOs' request for judicial notice at Docket Entry 33 is denied as moot and the request at Docket Entry 68 is stricken as improper supplemental briefing. The NGOs' request for judicial notice at Docket Entry 63 is granted.

VANDYKE, Circuit Judge, concurring:

I join the majority opinion in full.  I write separately to emphasize the demanding standard that must be met before a district court may issue a mandatory preliminary injunction, a standard that becomes even harder to satisfy in cases like this one which involve the complicated interplay between different species.

In general, district courts should hesitate before granting requests for mandatory preliminary injunctions.  Because mandatory preliminary injunctions disrupt the status quo before any party has definitively proven its case, our precedent repeatedly calls such injunctions "disfavored" and applies "a higher degree of scrutiny" to them, denying requests for mandatory preliminary injunctions unless the facts and law clearly favor the requesting party.  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 n.13 (9th Cir. 2019).  This means that mandatory preliminary injunction requests "are not issued in doubtful cases." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Anderson*, 612 F.2d at 1115).

Applying that rigorous standard in the Endangered Species Act context means that district courts must be confident that the relief granted will not adversely affect other species before pulling the trigger on a mandatory preliminary injunction.  Reaching such a conclusion with confidence is very challenging at the preliminary injunction stage in cases like this one.  The County's expert noted that steelhead likely prey on red-legged frog tadpoles and are known to eat the tidewater goby.  *See also* Endangered

Species Facts: Tidewater Goby, U.S. EPA, https://www.epa.gov/system/files/documents/2025-05/tidewater-goby.pdf (last visited Oct. 31, 2025). This evinces that injunction requested in this case may be a zero-sum game: an injunction that helps the steelhead inherently risks harming the goby and the frog. Add to this the fact that the South-Central California Coast steelhead at issue in this case is merely a "threatened" species, while the goby has the more serious "endangered" listing. 71 Fed. Reg. 834, 857 (Jan. 5, 2006); 59 Fed. Reg. 5494, 5495 (Feb. 4, 1994). In circumstances like these, proving that "the facts and law clearly favor" the party requesting a mandatory preliminary injunction is a difficult endeavor—as it should be. *Stanley*, 13 F.3d at 1320 (quoting *Anderson*, 612 F.2d at 1114). Because I don't understand the majority opinion to be inconsistent with that understanding, I am pleased to join it.